WELLS FARGO BANK, NA v CHERRYLAND MALL
LIMITED PARTNERSHIP

Docket No. 304682. Submitted December 14, 2011, at Lansing. Decided December 27, 2011, at 9:00 a.m. Remanded, 493 Mich 859.

Wells Fargo Bank, N.A., brought an action in the Grand Traverse Circuit Court against Cherryland Mall Limited Partnership, David Schostak, and Schostak Brothers & Co., Inc., to recover a deficiency owed under the terms of a mortgage. Cherryland had obtained an $8.7 million commercial mortgage-backed securities loan in 2002 from Archon Financial, LP, using a mall it owned as collateral. David Schostak was the guarantor of the loan. Archon transferred the Cherryland loan and attendant loan documents to Wells Fargo. After Cherryland's failure to make a loan payment, Wells Fargo foreclosed on the property by advertisement in 2010. Wells Fargo was the successful bidder at the foreclosure sale with a bid of $6 million, which left a deficiency of $2.1 million. Wells Fargo asserted that it was entitled to recover damages in the amount of the loan deficiency from both Schostak and Cherryland because Cherryland's insolvency constituted a failure to maintain its single-purpose-entity status as required by the loan documents. Wells Fargo moved for summary disposition on multiple grounds. The court, Philip E. Rodgers, Jr., J., granted Wells Fargo's motions in part, ruling that as guarantor on the mortgage, Schostak was liable for the loan deficiency. In addition, the court awarded attorney fees to Wells Fargo. Cherryland Mall and Schostak appealed.

The Court of Appeals *held*:

1. Generally, foreclosure extinguishes a mortgage, and mortgages are nonrecourse in Michigan absent an agreement to the contrary. A deficiency action for money owed under a mortgage following foreclosure by sale is permissible if the note provides that the loan was a recourse loan. Although the trial court decided the issue on incorrect grounds, Wells Fargo was entitled to maintain a mortgage deficiency action because the note provided that the debt was fully recourse.

2. The failure of the mortgage to define "single purpose entity" does not make the mortgage ambiguous. A term that is not defined

in a contract will be interpreted in accordance with its commonly used meaning, and terms in a particular trade are given their natural and ordinary meaning in that trade. Extrinsic evidence may be used to define an undefined technical term because it generally translates the language of the trade into ordinary language. A single purpose entity is an entity formed concurrently with or immediately before the transaction that is unlikely to become insolvent as a result of its own activities and is adequately insulated from the consequences of any related party's insolvency. The mortgage, as incorporated into the note, required Cherryland to remain solvent to maintain its single-purpose-entity status. The trial court properly determined that Cherryland breached the covenants of the mortgage requiring it to be a single purpose entity when it became insolvent, at which point the loan became fully recourse.

Affirmed.

1. MORTGAGES — FORECLOSURE BY ADVERTISEMENT — DEFICIENCY ACTION — RECOURSE.

Foreclosure generally extinguishes a mortgage, and mortgages are nonrecourse absent an agreement to the contrary; a deficiency action for money owed under a mortgage following foreclosure by sale is permissible, however, if the note provides that the loan was a recourse loan.

2. MORTGAGES — BREACH OF COVENANT — RECOURSE — SINGLE PURPOSE ENTITY STATUS VIOLATED.

A single purpose entity (SPE) is an entity formed concurrently with or immediately before the subject transaction that is unlikely to become insolvent as a result of its own activities and that is adequately insulated from the consequences of any related party's insolvency; if remaining solvent is part of the SPE covenants in a mortgage or loan document, an entity's insolvency breaches that covenant and may trigger provisions making a mortgage or loan fully recourse.

*Miller, Canfield, Paddock and Stone, P.L.C.* (by *James L. Allen, Larry J. Saylor*, and *Dennis G. Bonucchi*), for Wells Fargo Bank, N.A.

*Honigman Miller Schwartz and Cohn, LLP* (by *John Pirich* and *I. W. Winsten*), for Cherryland Mall Limited Partnership and David Schostak.

Amici Curiae:

*McClelland & Anderson, LLP* (by *Gregory L. McClelland* and *Melissa A. Hagen*), for the Michigan Association of Realtors.

*Kupelian Ormond & Magy, P.C.* (by *Paul S. Magy* and *Matthew W. Schlegel*), and *Fried, Frank, Harris, Shriver & Jacobson LLP* (by *Greg L. Weiner, Shahzeb Lari*, and *Nazar Altun*) for the Building Owners and Managers Association International, the Building Owners and Managers Association of Metro Detroit, the International Council of Shopping Centers, NAIOP – The Commercial Real Estate Development Association, and the National Association of Real Estate Investment Trusts.

*Robert S. LaBrant* for the Michigan Chamber of Commerce.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Christopher W. Braverman*, Assistant Attorney General, for the Attorney General.

Before: CAVANAGH, P.J., and SAWYER and METER, JJ.

PER CURIAM. In this mortgage deficiency action, defendants[1] Cherryland Mall Limited Partnership and David Schostak (Schostak) appeal as of right the trial court's judgment awarding plaintiff, Wells Fargo Bank, N.A., $2,142,697.86 on the mortgage deficiency claim and $260,000 in stipulated attorney fees and costs, plus interest. We affirm.

---

[1] Defendant Schostak Brothers & Co., Inc. is not involved in this appeal. Accordingly, references to "defendants" are only to Cherryland and Schostak.

I. BASIC FACTS AND PROCEDURAL HISTORY

At the heart of this case lies a commercial mortgage-backed securities (CMBS) loan. CMBS loans have a unique structure, as described by the Commercial Mortgage Securities Association and the Mortgage Bankers Association:

> Prior to the development of the CMBS market, commercial real estate was often financed on a recourse basis by banks, thrifts, specialty finance companies and other lenders. Such financing included a first mortgage lien on the real estate and a recourse note or guaranty allowing the lender to seek payment on the mortgage debt from the note obligor (customarily the property owner) or its constituent owner(s) as sureties. The holder of such a mortgage loan might hold the loan in its own portfolio as a whole loan or perhaps sell one or more pieces of it, often through traditional loan syndication or participation structures. With the advent of the CMBS market came the greater availability of non-recourse, asset specific financing for commercial real estate through the use of capital markets, an expansion that attracted new and varied sources of capital to this sector and permitted property owners to acquire and more easily finance real estate without putting their personal balance sheets at risk. In a simple CMBS structure, a lender would make a number of disparate mortgage loans to unrelated entities, then deposit each of the loans into a trust that would issue securities in the public or private markets backed by the cash flow and collateral from the pool of mortgage loans. These securities would be created in a senior/junior structure such that the more senior securities would have payment priority as to both interest and principal during the term as well as at liquidation (and hence a lower coupon rating reflecting the lower risk) over the more junior securities. . . . As many fixed income bond investors—that would otherwise not be active real estate lenders—could now participate in the commercial real estate market through the purchase of CMBS, the flow of capital to the commercial real estate mortgage markets increased significantly and played a major role in leading

the country out of the nationwide real estate depression caused by the savings and loan crisis of the late 1980s. . . .

One of the bedrock elements of a CMBS financing is the isolation of the asset to be financed. This is the essential bargain between borrower and lender that permits financing on a non-recourse basis: the lender agrees not to pursue recourse liability directly or indirectly against the borrower or its owners, provided that the lender can comfortably rely on the assurance that the financed asset will be "ring-fenced" from all other endeavors, creditors and liens related to the parent of the property owner or affiliates, and from the performance of any asset owned by such parent entity or affiliates. More specifically, it is not just the isolation of the real property asset, but the isolation of the cash flows coming from the operation of the real property, from which debt service is paid on the mortgage loan and subsequently distributed to the holders of the securities issued backed by such mortgages. . . .

The twin components of asset isolation are (i) separateness covenants (the "Separateness Covenants") and (ii) narrow limitations on the lender's general agreement not to pursue recourse liability (the "Limited Recourse Provisions"). . . .

The Separateness Covenants, while often referred to and discussed as a unitary concept, are really a package of separate and independent covenants made by a borrower to a CMBS lender. The following is a sample set of Separateness Covenants, taken from the form documents for a CMBS lender:

The borrower has not and, for so long as the mortgage loan shall remain outstanding, shall not:

\* \* \*

(xviii) fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds . . . .

\* \* \*

The Limited Recourse Provisions are the other key element of asset isolation in CMBS financing. It is important to note that the nature and purpose of this limited recourse is different from a financing that relies on recourse to the borrower, its parent or sponsor for additional credit enhancement beyond the security offered by the mortgaged property. In a CMBS financing, in the event of certain "bad acts" (the "Recourse Triggers") on the part of the borrower and/or its affiliates, the lender's basic agreement not to pursue recourse liability against a borrower or its owners or principals has limited application, allowing the lender to pursue recourse as part of its remedies. The Recourse Triggers would typically be divided into two categories, with differing recourse consequences. In the first category, the recourse would be limited to the amount of any losses incurred by the lender. These Recourse Triggers include [fraud, intentional misrepresentation, misappropriation of rents if the loan were in default, misappropriation of insurance proceeds, actual waste or arson]. To pursue recourse under any of the foregoing Recourse Triggers, a lender would have to establish not only the existence of the Recourse Trigger, but also determine the magnitude of its resulting loss.

For the second category of Recourse Triggers, the lender could seek recourse liability against the borrower in the amount of the total outstanding balance of the mortgage loan, plus any accrued and unpaid interest, regardless of whether the lender had actually suffered a loss. These Recourse Triggers are:

(i) a material breach by borrower [or] its affiliates of the Separateness Covenants;

(ii) any breach of the due-on-transfer or due-on-encumbrance provisions of the loan documents; or

(iii) any voluntary or collusive involuntary bankruptcy or insolvency filing by or on behalf of the borrower.

This list of Recourse Triggers, taken from the document template for a CMBS lender, is representative of the

limitations found in most CMBS loans. Both with respect to the Recourse Triggers tied to actual losses and those triggering full recourse liability for the entire loan amount, the purpose is the same, namely to provide a credible and enforceable disincentive for the borrower to engage in any act that would constitute a Recourse Trigger. This is wholly different in concept as compared to a recourse-based financing that relies on a direct payment obligation by the borrower or a payment guaranty from its parent as credit support for the loan. [Amended brief of amici curiae Commercial Mortgage Securities Association and Mortgage Bankers Association, filed in *In re Gen Growth Props, Inc*, 409 BR 43 (SD NY, 2009), pp 4-14.]

In October 2002, Cherryland obtained an $8.7 million CMBS loan from Archon Financial, LP, using the mall it owned located at 1712 S. Garfield Road, Garfield Township, Michigan, as collateral. Schostak was the guarantor on the loan. At closing, Cherryland executed the mortgage, note, and assignment, along with other documents, and Schostak signed the guaranty (collectively, the loan documents). Archon transferred the Cherryland loan and the attendant loan documents to plaintiff. The loan was then made a part of a real estate mortgage investment conduit (REMIC) trust, which is governed by a pooling and servicing agreement dated December 1, 2002. Plaintiff is the trustee of the REMIC trust, which contains the Cherryland loan as part of its $685 million pool of CMBS loans.

In 2009, Cherryland failed to make the August 1, 2009, mortgage payment. Plaintiff ultimately commenced foreclosure by advertisement, and the sheriff's sale was conducted on August 18, 2010. Plaintiff was the successful bidder with a bid of $6 million, leaving a deficiency of roughly $2.1 million.

On August 19, 2010, the day after the foreclosure sale, plaintiff filed the instant action against Cherry-

land to enforce the loan documents. Plaintiff subsequently filed an amended complaint, adding Schostak as a defendant as the guarantor of the loan. Plaintiff asserted that it was entitled to recover damages in the amount of the loan deficiency from both Cherryland and Schostak because Cherryland's insolvency constituted a failure to maintain its single purpose entity (SPE) status.

On January 31, 2011, after the close of discovery, plaintiff filed multiple summary disposition motions under MCR 2.116(C)(10) and a motion to disgorge attorney fees. Motion No. 1 sought a judgment against Schostak, as the guarantor, for the entire loan deficiency on the ground that Cherryland's insolvency constituted a failure to maintain its SPE status. Motion No. 2 also sought a judgment against Schostak as the guarantor for the entire loan deficiency, but on the additional ground that Cherryland had entered into unfair transactions with an affiliate, also an alleged failure to maintain its SPE status. Motion No. 4[2] also sought a judgment against Schostak, again as the guarantor, for $61,958 for a distribution Cherryland made to its owners in 2010. Motion No. 5 requested that defendants' attorneys disgorge $34,371 in attorney fees that they received from Cherryland.

After hearing arguments from the parties, the trial court ruled from the bench and found in favor of plaintiff on Motion Nos. 1, 4, and 5, but in favor of defendants on Motion No. 2. After the trial court's ruling, the parties placed several stipulations on the record, one of which related to attorney fees. Subsequently, the parties disagreed about the order for Motion No. 4 (summary disposition for $61,958). Plaintiff

---

[2] Motion No. 3 related solely to Schostak Brothers & Co., Inc., and is accordingly not relevant to this appeal.

demanded that the order for that claim also include a $260,000 attorney-fee award; defendants claimed that the stipulation was for $260,000 for the entire action related to the $2,142,697 mortgage deficiency, not just the $61,958 claim, particularly because the $61,958 claim had only been asserted in the second amended complaint, filed just one month before. After a hearing, the trial court determined that the $260,000 attorney-fee stipulation would also be included in the order for Motion No. 4. The final judgment was then entered. Defendants moved for reconsideration on March 28, 2011, which the trial court denied.

Defendants appeal only two of the trial court's rulings: (1) On Motion No. 1, they challenge the finding that Schostak, as guarantor, was liable for the entire loan deficiency on the basis of the trial court's conclusion that insolvency was a violation of Cherryland's SPE status, and (2) on Motion No. 4, they challenge the attorney fee award of $260,000.

## II. STANDARD OF REVIEW

We review de novo the trial court's decision to grant motions for summary disposition brought under MCR 2.116(C)(10). *Dressel v Ameribank*, 468 Mich 557, 561; 664 NW2d 151 (2003). The facts are considered in the light most favorable to the nonmoving party. *Id*. We review the record and the documentary evidence, but do not make findings of fact or weigh credibility. *Taylor v Lenawee Co Bd of Co Rd Comm'rs*, 216 Mich App 435, 437; 549 NW2d 80 (1996).

We also review de novo issues involving the proper interpretation of a contract or the legal effect of a contractual clause. *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

III. ANALYSIS

A. SUIT ON THE MORTGAGE

Defendants first contend that the mortgage was extinguished upon its foreclosure, thereby barring plaintiff's lawsuit because it was initiated after the foreclosure sale, at which time the mortgage—and, thus, its terms and conditions—no longer existed. Generally speaking, defendants are correct that foreclosure extinguishes a mortgage. See *Senters v Ottawa Savings Bank, FSB*, 443 Mich 45, 56; 503 NW2d 639 (1993) ("[P]laintiff and defendant were parties to a mortgage agreement that was extinguished by the foreclosure sale in August of 1989."); *New York Life Ins Co v Erb*, 276 Mich 610, 615; 268 NW 754 (1936) ("A mortgage is not extinguished by foreclosure until the sale."). In addition, MCL 565.6 provides that absent agreement to the contrary, mortgages are nonrecourse in Michigan:

> No mortgage shall be construed as implying a covenant for the payment of the sum thereby intended to be secured; and where there shall be no express covenant for such payment contained in the mortgage, and no bond or other separate instrument to secure such payment, shall have been given, the remedies of the mortgagee shall be confined to the lands mentioned in the mortgage.

See, also, 1 Cameron, Michigan Real Property Law (3d ed), § 18.11, pp 687-688.

The trial court concluded that the terms and conditions of the mortgage had not been extinguished by the foreclosure because ¶ 36 of the mortgage provided for indemnification for losses based on the failure of the mortgagor to comply with the terms of the mortgage and such indemnification survived any foreclosure. Defendants argue that ¶ 36 was inapplicable because plaintiff's cause of action was not for indemnification.

We find it unnecessary to determine whether the mortgage was extinguished or whether the indemnification provision in ¶ 36 was applicable because, even accepting defendants' arguments as true, plaintiff still has a basis for its lawsuit.

Our Supreme Court has long held that actions at law are permissible for deficiencies on foreclosures by advertisement:

> "While it is true that a sale on statutory foreclosure satisfies the debt secured by the foreclosed mortgage *to the extent of the proceeds of the sale,* and *thus far* releases the personal obligation, yet\*\*\*."

> As the general rule has been recognized by our legislature and court and is fundamentally sound, we hold that an action at law may be instituted for the deficiency on statutory foreclosure of a mortgage. [*New York Life,* 276 Mich at 613, quoting *Moore v Smith,* 95 Mich 71, 76; 54 NW 701 (1893).]

The basis for such deficiency lawsuits is not the mortgage, as both parties assume, but the note:

> When the borrower cannot repay a loan and the lender pursues foreclosure, the lender may or may not be able to sue the borrower to collect any shortfall commonly known as a deficiency. The key difference is whether or not that loan is classified as a recourse loan or a nonrecourse loan. If the loan is recourse, the lender can attempt to collect a deficiency, which must be done through a court action. This can be done either as part of a judicial foreclosure or as a separate action filed after a foreclosure by advertisement is completed. In either event, *it is based on the enforcement of the covenants of the note* signed by the borrower. [Nathanson, Michigan Residential Real Estate Transactions (ICLE) (2009 update), § 11.2, p 568 (emphasis added).]

In this case, ¶ 49 of the mortgage, setting forth the recourse provisions, is identical to ¶ 13 of the note

except that the mortgage uses the terms "Mortgagor/Mortgagee" and the note uses the terms "Borrower/Lender." The note provides:

> Notwithstanding anything to the contrary in this Note or any of the Loan Documents, . . . the Debt shall be fully recourse to Borrower in the event that . . . Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of the Mortgage . . . .

The terms of the note thus entitled plaintiff to maintain a suit for a deficiency judgment. Accordingly, we affirm the trial court's decision to permit plaintiff's lawsuit, albeit for different reasons. *Gleason v Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003).

### B. SINGLE PURPOSE ENTITY REQUIREMENTS AND VIOLATIONS

Defendants next argue that the trial court erred by holding defendants liable for the deficiency on the basis of a violation of the mortgage's SPE requirements. They contend that either the mortgage was unambiguously nonrecourse and insolvency was not a violation of Cherryland's SPE status or that the mortgage was ambiguous and the extrinsic evidence presented showed that solvency was not required to maintain SPE status.

The note, mortgage, and guaranty all provide, in nearly identical language, that the loan debt becomes fully recourse with respect to the borrower (mortgage and note) or the guarantor (guaranty) in the event that Cherryland "fails to maintain its status as a single purpose entity as required by, and in accordance with the terms and provisions of this Mortgage." Indeed, there is no dispute between the parties that the loan documents provide for full recourse liability if Cherryland failed to maintain its "single purpose entity" status. However, they do dispute what the language "as

required by, and in accordance with the terms and provisions of the Mortgage" means. In other words, the parties disagree about what Cherryland must do to maintain that status, which presents a straightforward question of contract interpretation.

"In interpreting a contract, our obligation is to determine the intent of the contracting parties." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Id*. Courts " 'must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.' " *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003) (citation omitted). "[I]f the language of a contract is clear and unambiguous, its construction is a question of law for the court." *Mich Nat'l Bank v Laskowski*, 228 Mich App 710, 714; 580 NW2d 8 (1998). However, "the meaning of an ambiguous contract is a question of fact that must be decided by the jury" or other trier of fact. *Klapp*, 468 Mich at 469. A " 'contract is ambiguous when its provisions are capable of conflicting interpretations.' " *Id*. at 467 (citation omitted). But "[i]f the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous." *Meagher v Wayne State Univ*, 222 Mich App 700, 722; 565 NW2d 401 (1997).

As an initial matter, we observe that although the suit is premised on the note, we must still interpret the terms of the mortgage as they relate to SPE status because the note and guaranty expressly incorporate those provisions. See *Forge v Smith*, 458 Mich 198, 207; 580 NW2d 876 (1998) ("Where one writing references another instrument for additional contract terms, the

two writings should be read together."). Accordingly, the first question is whether the mortgage provisions are unambiguous. If so, we may interpret the contract as a matter of law. *Mich Nat'l Bank*, 228 Mich App at 714. If not, the case must be remanded for trial because summary disposition was inappropriate. *Klapp*, 468 Mich at 469.

Paragraph 9 of the mortgage provides as follows:

> **9. Single Purpose Entity/Separateness.** Mortgagor covenants and agrees as follows:
>
> (a) Mortgagor does not own and will not own any asset or property other than (i) the Mortgaged Property, and (ii) incidental personal property necessary for the ownership and operation of the Mortgaged Property.
>
> (b) Mortgagor will not engage in any business other than the ownership, management and operation of the Mortgaged Property.
>
> (c) Mortgagor will not enter into any contract or agreement with any affiliate of the Mortgagor, any constituent party of the Mortgagor, Guarantor, or any affiliate of Guarantor, or any constituent party of the Guarantor, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.
>
> (d) Mortgagor does not have as of the date hereof and will not after the date hereof incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (i) the Debt, (ii) unsecured trade and operational debt incurred in the ordinary course of business with trade creditors and in amounts as are normal and reasonable under the circumstances, (iii) debt incurred in the financing of equipment and other personal property used on the Premises and (iv) debt incurred to obtain the Letter of Credit and Replacement Letter of Credit. No indebtedness other than the Debt may be secured (subordinate or pari passu) by the Mortgaged Property.

(e) Mortgagor does not have oustanding as of the date hereof and will not make after the date hereof any loans or advances to any third party (including any affiliate or constituent party of Mortgagor, Guarantor, or any affiliate or any constituent party of Guarantor), and shall not acquire obligations or securities of its affiliates or any constituent party.

(f) *Mortgagor is and will remain solvent and Mortgagor will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.*

(g) Mortgagor has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, good standing and right to do business in the state where it is organized or registered and in the state where the Premises are located, and Mortgagor will not, and will not permit any general partner, manager or managing member, as the case may be, or Guarantor, to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, articles of organization and operating agreement, trust or other organizational documents of Mortgagor or such other party in any material respect or in any manner which violates or is contrary to this Paragraph 9, without the prior written consent of Mortgagee.

(h) Mortgagor will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party and Mortgagor will file its own tax returns. Mortgagor shall maintain its books, records, resolutions and agreements as official records.

(i) Mortgagor will be, and at all times will hold itself out to the public as, a legal entity separate from any other entity (including any affiliate or any constituent party of Mortgagor, Guarantor, or any affiliate [or] any constituent party of Guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks.

(j) Mortgagor will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k) Neither Mortgagor, Guarantor nor any general partner, managing member or manager, as the case may be, of Mortgagor or Guarantor, will seek the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of the Mortgagor, Guarantor or such entity's general partner, managing member or manager.

(*l*) Mortgagor will not commingle the funds and other assets of Mortgagor with those of any affiliate or constituent party of Mortgagor, Guarantor, or any affiliate or any constituent party of Guarantor, or any other person.

(m) Mortgagor will maintain its assets in such manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party of Mortgagor, Guarantor, or any affiliate or any constituent party of Guarantor, or any other person.

(n) Mortgagor will not hold itself out to be responsible for the debts or obligations of any other person.

(o) If Mortgagor is a limited partnership or a limited liability company, its general partner, manager or managing member, as the case may be, shall be an entity whose sole asset is its interest in Mortgagor and each such general partner, manager or managing member will at all times comply, and will cause Mortgagor to comply, with each of the agreements and covenants contained in this Paragraph 9 as if such agreement and covenant was made directly by such general partner, manager or managing member. [Emphasis added.]

Plaintiff asserts that Cherryland became insolvent in violation of the dictates of ¶ 9(f) of the mortgage—which required Cherryland to remain solvent to maintain its SPE status—and thus triggered full recourse against the borrower and the guarantor pursuant to the terms of the loan documents. Defendants contend that ¶ 9(f) is not a requirement to maintain SPE status.

Defendants first point out that the mortgage does not define "single purpose entity." However, the failure to define a contractual term does not render a contract ambiguous. *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999). "Rather, if a term is not defined in a contract, we will interpret such term in accordance with its 'commonly used meaning.' " *Terrien v Zwit*, 467 Mich 56, 76-77; 648 NW2d 602 (2002), quoting *Henderson*, 460 Mich at 354. "Terms in a particular trade are given their natural and ordinary meaning in that trade." *Ososki v St Paul Surplus Lines*, 156 F Supp 2d 669, 675 (ED Mich, 2001). Furthermore,

> "[p]arol evidence is always receivable to define and explain the meaning of words or phrases in a written instrument which are technical and not commonly known, or which have two meanings—the one common and universal and the other technical. Similarly, where a new and unusual word or phrase is used in a written instrument, or where a word or phrase is used in a peculiar sense as applicable to a particular trade, business, or calling or to any particular class of people, it is proper to receive extrinsic evidence to explain or illustrate the meaning of that word or phrase. Such evidence neither varies nor adds to the written memorandum, but merely translates it from the language of trade into the ordinary language of the people generally." [*Moraine Prod, Inc v Parke, Davis & Co*, 43 Mich App 210, 213; 203 NW2d 917 (1972) (citation omitted).]

The record makes clear that "single purpose entity" is a specific, technical term in the mortgage business. Accordingly, the trial court erred both by failing to define "single purpose entity" and by failing to consider extrinsic evidence to the extent necessary to determine definitions for "single purpose entity" and "separateness."[3]

---

[3] Remand is unnecessary, however, because interpretation of an unambiguous contract is a matter of law. *Mich Nat'l Bank*, 228 Mich App at

Quoting the integration clause of the guaranty, ¶ 5.12, plaintiff asserts that use of extrinsic evidence was expressly excluded. The clause provides:

> Entirety. THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUAR-ANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDER-STANDINGS, WHETHER WRITTEN OR ORAL, RELAT-ING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EX-TRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREE-MENT. THERE ARE NO ORAL AGREEMENTS BE-TWEEN GUARANTOR AND LENDER.

Assuming, without deciding, that the integration clause in the guaranty is controlling in this case,[4] plaintiff's argument still fails. The integration clause provides that no extrinsic evidence may be used "to contradict, vary, supplement or modify any term of this guaranty agreement." (Formatting altered to lower-case.) Here, however, extrinsic evidence is being used to define an undefined technical term. Such a use " 'nei-

---

714. Accordingly, we may determine the definition of "single purpose entity" and construe the mortgage accordingly.

[4] Notably, the note does not contain an integration clause, and the one in the mortgage does not contain any language expressly prohibiting extrinsic evidence.

ther varies nor adds to the written memorandum, but merely translates it from the language of trade into the ordinary language of the people generally.' " *Moraine Prod, Inc*, 43 Mich App at 213 (citation omitted); see, also, 5 Corbin, Contracts (rev ed), § 24.12, p 108 (stating that when "the court seeks merely to interpret a contract term, which is to discern the meaning of a term already contained in the contract, the question of whether the parties intended their agreement to be integrated is not relevant"). Therefore, we may and must turn to the extrinsic evidence in the record to determine the trade definition for "single purpose entity."

A "single purpose entity" "is an entity, formed concurrently with or immediately prior to the subject transaction, that is unlikely to become insolvent as a result of its own activities and that is adequately insulated from the consequences of any related party's insolvency." *U.S. CMBS Legal and Structured Finance Criteria*, Standard & Poors, May 1, 2003, at 89. Nothing in this definition suggests, however, that all the items found in ¶ 9 of the mortgage document are not required to maintain SPE status. Indeed, a further review of the extrinsic evidence provided by defendants actually counsels against their interpretation.

In the New York bankruptcy amici curiae brief provided by defendants, the Commercial Mortgage Securities Association and the Mortgage Bankers Association made no explicit reference to the term "single purpose entity." Rather they stated that "[o]ne of the bedrock elements of a CMBS financing is the isolation of the asset to be financed" and that "[t]he twin components of asset isolation are (i) separateness covenants . . . and (ii) narrow limitations on the lender's general agreement not to pursue recourse liability . . . ." In addition,

the sample separateness provisions set forth in the brief contain most of the provisions included in ¶ 9 of the mortgage document in this case, including the solvency provision in ¶ 9(f).[5] Indeed, only the provision in ¶ 9(o) of the mortgage has no equivalent provision in the list of separateness covenants found in the brief. On the one hand, that could indicate that defendants are correct and that there are, in fact, no SPE covenants contained in the mortgage, only separateness covenants. However, a different interpretation is more likely: that separateness is a component part of SPE, so that maintaining SPE status requires abiding by the separateness covenants. This interpretation accepts that "single purpose entity" and "separateness" are two different concepts, but recognizes that they are intertwined, making the singular heading "Single Purpose Entity/Separateness" in the mortgage both logical and unambiguous.

This interpretation is also consistent with ¶ 43 of the mortgage, which provides that headings and captions "are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof." The heading at issue here is simply being used as a reference. The note, guaranty, and mortgage all refer to Cherryland's need to maintain its SPE status. The heading "Single Purpose Entity/Separateness" simply provides a reference point in the mortgage to where one should look for that information.

Defendants and the amici curiae in this case argue that this interpretation is inconsistent with ¶ 43 be-

---

[5] The paragraphs of the mortgage matching provisions in the brief are: 9(a) = (ii); 9(b) = (i); 9(c) = (ix); 9(d) = (vii); 9(e) = (xii); 9(f) = (xviii); 9(g) = (iv); 9(h) = (viii); 9(i) = (xiv); 9(j) = (xv); 9(k) = (xvi); 9(*l*) = (vi); 9(m) = (x); and 9(n) = (xi).

cause it results in the heading defining and limiting the provisions of the mortgage. We disagree. If the mortgage contained provisions throughout that referred to requirements for maintaining SPE status and the provisions were interpreted as not being full recourse triggers because they did not appear in ¶ 9, this interpretation would violate ¶ 43 because the heading for ¶ 9 would limit or define the mortgage. That is not the case here. Rather, the loan documents all refer to the need to maintain "single purpose entity" status as provided in the mortgage, rendering it necessary to look at the mortgage and see what it requires. The logical and reasonable approach is to find references in the mortgage to the term "single purpose entity." As long as each reference to the term contained in the mortgage is considered, ¶ 43 is not violated. In this case, the *only* reference is the heading. Therefore, it is natural and logical to conclude that *all* of ¶ 9, and *only* ¶ 9, sets forth the terms necessary to maintain SPE status.

Further, the interpretation suggested by defendants and the amici curiae violates the rules of contract construction because it renders multiple portions of the loan documents nugatory. "A court must 'give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory.' " *Laurel Woods Apartments v Roumayah*, 274 Mich App 631, 638; 734 NW2d 217 (2007), quoting *Klapp*, 468 Mich at 468. Defendants rely on ¶ 43 to assert that the headings must be ignored, resulting in there being no reference to "single purpose entity" in the mortgage documents and, therefore, nothing that defendants had to do to maintain SPE status. This interpretation not only renders the heading of ¶ 9 nugatory, which is not the purpose of ¶ 43, but also renders nugatory the provisions of the mortgage, note, and guaranty documents

that provide that the loan would become fully recourse in the event that Cherryland failed to maintain its SPE status. Given that no fewer than three of the loan documents at issue include the failure to maintain SPE status as a full recourse trigger, it is unreasonable to interpret the mortgage as having no such requirements.

Defendants are correct in their assertion that no cases have held that insolvency is a violation of SPE status. However, the interpretation adopted by the trial court is supported by federal caselaw from Louisiana and Massachusetts and is consistent with a 2001 trial court ruling from Wayne County. The guaranties and mortgages in those cases involved loan documents with headings similar or identical to ¶ 9(f): Single Purpose Entity/Separateness" or "Maintain Single-Purpose Entity Status." Accordingly, those courts' determinations that all the covenants found below the heading were required to maintain SPE status render them squarely on point to the present case, regardless of which of the listed covenants was actually breached.

In *LaSalle Bank NA v Mobile Hotel Props, LLC*, 367 F Supp 2d 1022, 1025-1026 (ED La, 2004), the plaintiff lender sought a deficiency judgment against the defendant borrower, alleging that the full recourse provisions were triggered when the defendant amended its articles of organization and incurred additional debt without the lender's consent. The court noted that the mortgage provided, "(ii) *the Debt shall become fully recourse to Mortgagor* in the event that: . . . (B) Mortgagor . . . fails to maintain its status as a single purpose entity, [] as required by, and in accordance with the provisions of, this Mortgage . . . ." *Id*. at 1029 (quotation marks omitted; some alterations in original). The court then noted, "The Single Purpose Entity/Separateness provision of the mortgage, at ¶ 10, includes a list of fourteen sepa-

rate conditions, representations, covenants or warranties required of the mortgagor that describe and define the scope and limits of the single purpose entity and separateness requirements." *Id.* Looking at ¶ 10 of the *LaSalle Bank* mortgage, it is almost identical to ¶ 9 of the mortgage in this case and included a provision requiring solvency. The *LaSalle Bank* mortgage also contained an identical provision regarding headings. Because the court concluded that all 14 items in ¶ 10 of the *LaSalle Bank* mortgage were requirements that, if violated, resulted in full recourse liability, it made no difference which of the 14 covenants were at issue:

> In its memorandum in support of its motion for summary judgment, LaSalle argues that several additional warranties and covenants were also violated by Borrower, further compromising its status as a single purpose entity and triggering the full recourse provision of the Mortgage and Mortgage Note. Finding that the Borrower's violation of any one of the covenants listed [is] sufficient to make the Mortgage a full recourse obligation, the Court does not discuss these additional "violations". [*Id.* at 1029 n 7.]

Thus, had the defendant in *LaSalle* been found to be insolvent, rather than as having amended its articles of organization, the result would have been identical to the instant case.

In *Blue Hills Office Park LLC v JP Morgan Chase Bank*, 477 F Supp 2d 366, 377 (D Mass, 2007), the defendant lender filed a counterclaim against the plaintiff borrower for a $10.7 million deficiency under a nonrecourse loan. The lender argued that, by transferring parts of the mortgaged property without prior written consent from the lender, the borrower had breached the mortgage agreement and became liable for the deficiency. *Id.* The court also found a violation of the guaranty because the borrower "failed to maintain its status as a single purpose entity." *Id.* at 382. It noted

that the guaranty "unambiguously states that the '[g]uarantor shall be liable for the full amount of the Debt in the event that . . . B) Borrower fails to maintain its status as a single purpose entity, as required by, and in accordance with, the Mortgage' " and concluded that "[p]aragraph 12 of the mortgage agreement provides the covenants to which [the borrower] agreed concerning its single purpose entity status." *Id.* (some alterations in original). As was true of both the *LaSalle Bank* mortgage and the mortgage in the instant case, the *Blue Hills* mortgage contained a single section titled "Single Purpose Entity/Separateness" that provided multiple covenants, including one regarding remaining solvent, as well as an identical headings section. Again, different covenants were violated by the borrower— ¶ 12(*l*), (m), and (r)—but the result was the same: "Consequently, [borrower] has failed to maintain its status as a single purpose entity and, as a result, violated section 1.2 of the guaranty." *Id.* at 383. The reasoning from *Blue Hills* is entirely consistent with the trial court's interpretation in the present case.

Finally, plaintiff has provided a copy of a transcript of a 2001 hearing and some exhibits in *Wells Fargo Bank Minnesota, NA v Leisure Village Assoc*, Wayne Circuit Court, Docket No. 00-031860-CZ. The *Leisure Village* documents are slightly different and, arguably, more clearly written, but suggest the same result. The note provided that "the agreement not to pursue recourse liability shall become null and void in the event of borrowers' default under Section 13 or 25 of the mortgage." Section 25 of the mortgage provided:

> SINGLE PURPOSE ENTITY. Until the Indebtedness is paid in full, Mortgagor shall maintain its status as a Single Purpose Entity and comply with all those covenants with respect to its status as a Single Purpose Entity as set forth in Section 5.4 of the Loan Agreement.

Section 5.4 of the loan agreement is titled "Maintain Single-Purpose Entity Status," and sets forth 19 covenants, including a requirement that the borrower will not "become insolvent or fail to pay its debts from its assets as the same shall become due." Although the borrower was alleged to have violated a different subsection, the defendants made arguments identical to those made to this Court, i.e., that only some of the covenants listed pertained to single purpose entity status. In *Leisure Village*, the trial court noted:

> Defendant[s] argue that only a few of the 19 covenants are directed toward the maintenance of a single purpose entity and none of those have been violated. In other words, defendants argue that Leisure Village Associates, in order to avoid a default under Section 25 of the mortgage, was only required to comply with those particular covenants, the non-compliance with which would destroy its status as a single purpose entity. The Court disagrees.

> The important sentence in Section 25 has two parts, separated with the word "and." It states first that the mortgagor shall maintain its status as a single purpose [entity], then states, after the word and, a separate duty. To comply with all those covenants with respect to its status as a single purpose entity as set forth in Section 5.4 of the loan agreement.

> Defendants['] reading of the sentence renders the second clause superfluous for purposes of Section 25 of the mortgage. . . .

> As set forth above, Section 25 states that the borrower shall comply with all those covenants with respect to its status as a single purpose entity, as set forth in Section 5.4 of the loan agreement. This is, obviously, a reference to the fact that Section 5.4 is captioned "Maintain Single Purpose Entity Status."

> Defendant [sic] states that the Court must disregard the caption because mortgage section 29 states that the captions and headings of the sections of this instrument shall

be disregarded in construing this instrument. However, 5.4 appears in the loan agreement, which states that headings are for convenience of reference only, are not to be considered part thereof, and shall not limit or otherwise effect [sic] any of the terms hereof.

In referencing the maintaining of single purpose entity status, the mortgage references the section of the loan agreement captioned "Maintain Single Purpose Entity Status." In other words, it references the entire section, which it may do properly under the language of the loan agreement.

\* \* \*

The Court agrees with plaintiff that the language of the agreement is clear as a matter of law, ultimately and after much reading, and that to violate any of the provisions of Section 5.4 is, in fact, a default under Section 25 of the mortgage. Defendant[s] argue[] that this interpretation would make no sense and must be improper, because otherwise the loan would become recourse if, for example, Leisure Village ever failed to pay any debt. I agree that such relief seems extreme, but it should be remembered that the lender stated specifically in the preamble that the exceptions were being placed in that section in order to induce the lender to make the loan. The borrowers were apparently not able to negotiate for less strict language and this Court declines to write it into the contract.

Thus, the trial court in *Leisure Village* dealt with, and rejected, all the arguments made by defendants in this case. Further, even ignoring the differences in the documents and their interplay, what is clear in each of these cases, but especially from the clarity in the *Leisure Village* ¶ 5.4 reference, is that maintaining solvency is always one of the covenants required to maintain SPE status. Indeed, there is no reference at all in the *Leisure Village* mortgage or loan agreement to "separateness" covenants. Thus, cases interpreting

similar loan documents do not support defendants' position that all the covenants contained in ¶ 9 of the mortgage do not relate to maintaining SPE status.

Defendants argue in the alternative that even if ¶ 9(f) was an SPE requirement, it was not breached. Defendants assert that the provision was intended to prevent owners from removing all the money from Cherryland, thereby leaving it without assets sufficient to pay its debts. And because the owners did not remove any assets in the three years predating the default, Cherryland's insolvency was not created by the owners and was therefore not a violation of ¶ 9(f).

First, defendants do not contend that ¶ 9(f) is ambiguous; thus, there is no reason to resort to extrinsic evidence to interpret it. Second, the parties agree that Cherryland became insolvent. Cherryland's only basis for its contention that ¶ 9(f) was not violated is that the insolvency was based not on its own actions, but on the downward spiral of the market. Paragraph 9(f), however, does not require insolvency to occur in any specific manner. Rather, any failure to remain solvent, no matter what the cause, is a violation. As the court noted in *LaSalle Bank*, 367 F Supp 2d at 1030:

> It is irrelevant that [the borrower] did not ever actually engage in, or for that matter, never intended to engage in, any activity other than the operation of the hotel property. *Its motive* for amending its Articles of Organization *is also irrelevant. . . .*
>
> The language of the mortgage means what it says. [The borrower]'s amendment of its Articles of Organization breached the covenant to maintain its status as a single purpose entity and triggered the full recourse provision of the mortgage. [Emphasis added.]

Similarly, the mortgage in the instant case has no scienter requirement. Cherryland was required to re-

main solvent and it failed to do so. That failure breached the covenant to maintain its status as an SPE and triggered the full recourse provision of the mortgage.

We recognize that our interpretation seems incongruent with the perceived nature of a nonrecourse debt and are cognizant of the amici curiae's arguments and calculations that, if accurate, indicate economic disaster for the business community in Michigan if this Court upholds the trial court's interpretation. Nevertheless, the documents at issue appear to be fairly standardized nationwide, and defendants elected to take that risk—as did many other businesses in Michigan and nationwide. It is not the job of this Court to save litigants from their bad bargains or their failure to read and understand the terms of a contract. See *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 567; 596 NW2d 915 (1999) (" 'This court has many times held that one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.' ") (citation omitted); *Allied Supermarkets, Inc v Grocers' Dairy Co*, 391 Mich 729, 737; 219 NW2d 55 (1974) ("A court of equity may not be used . . . as the means of avoiding the consequences of a legal contract now regarded as a bad bargain."). Indeed, our Supreme Court has made clear that

> [t]his approach, where judges divine the parties' reasonable expectations and then rewrite the contract accordingly, is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstances, such as a contract in violation of law or public policy. [*Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003).]

Defendants and the amici curiae attempt to invoke this Court's power to avoid enforcement by alleging that these contracts violate public policy. However, our Supreme Court has consistently stated that it is the role of the Legislature to address matters of public policy:

> " 'As a general rule, making social policy is a job for the Legislature, not the courts. See *In re Kurzyniec Estate*, 207 Mich App 531, 543; 526 NW2d 191 (1994). This is especially true when the determination or resolution requires placing a premium on one societal interest at the expense of another: "The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's." *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 542; 273 NW2d 829 (1979).' "

* * *

This case illustrates why this Court should frequently defer policy-based changes in the common law to the Legislature. When formulating public policy for this state, the Legislature possesses superior tools and means for gathering facts, data, and opinion and assessing the will of the public. . . .

The judiciary, by contrast, is designed to accomplish the discrete task of resolving disputes, typically between two parties, each in pursuit of the party's own narrow interests. We are " 'limited to one set of facts in each lawsuit, which is shaped and limited by arguments from opposing counsel who seek to advance purely private interests.' " We do not generally consider the views of nonparties on questions of policy, and we are limited to the record developed by the parties. The reality of our judicial institutional limitations is a significant liability in regard to our ability to make informed decisions when we are asked to create public policy by changing the common law. [*Woodman v Kera LLC*, 486 Mich 228, 245-247; 785 NW2d 1 (2010) (opinion by YOUNG, J.) (citations omitted).]

In summary, on the basis of the rules of contract interpretation and the persuasive authority of decisions of other courts that have interpreted nearly identical loan documents, we agree with the trial court that the mortgage, as incorporated into the note, unambiguously required Cherryland to remain solvent in order to maintain its SPE status. Having admittedly become insolvent, Cherryland violated the SPE requirements, resulting in the loan becoming fully recourse.[6]

Affirmed. No costs, a significant question of public interest being involved.

CAVANAGH, P.J., and SAWYER and METER, JJ., concurred.

---

[6] In light of our affirmance, we need not consider defendants' claims related to the attorney-fee stipulation.