**WHITESELL CORPORATION,**
Plaintiff–Appellee/Cross–
Appellant,

v.

**WHIRLPOOL CORPORATION, Whirl-pool Mexico S.A. Dec. V., and Joseph Sharkey,** Defendants–Appel-lants/Cross–Appellees.

Nos. 10–1702, 10–1761.

United States Court of Appeals,
Sixth Circuit.

Aug. 23, 2012.

Before: GUY and DONALD, Circuit Judges; and O'MEARA, District Judge.*

## OPINION

BERNICE B. DONALD, Circuit Judge.

Whitesell Corporation ("Whitesell") brought a claim against Whirlpool Corporation ("Whirlpool") for breach of their Strategic Alliance Agreement ("SAA"), alleging that Whirlpool purchased parts from suppliers that should have been purchased from Whitesell. At trial, the jury awarded Whitesell $25.7 million in damages—$22.4 million of which was for lost profits for Whirlpool's breach of the SAA. After the district court made adjustments for interest, Whitesell's total judgment came to $33,134,281. Whirlpool appeals the verdict arguing that the lost profits award should be reversed based upon a liability-limiting clause in the SAA. Whitesell cross-appeals the application of pre-judgment and post-judgment interest. For the following reasons, we **AFFIRM.**

## BACKGROUND

In 1995, Whirlpool and Whitesell entered into a long term requirements contract called a Strategic Alliance Agreement ("SAA") under which Whitesell was to be Whirlpool's strategic supplier of its volume requirements for cold-headed/threaded fasteners. When the 1995 agreement expired, the parties negotiated and entered into another SAA to run from March 15, 2002 until December 31, 2007. The SAA was to renew automatically for one year unless notice of termination was

---

* The Honorable Corbett O'Meara, United States District Judge for the Eastern District of Michigan, sitting by designation.

given to the other party 6 months prior to the effective termination date. As part of the SAA, the parties attached exhibits that listed (1) parts currently being supplied by Whitesell to Whirlpool (Exhibit B), (2) parts that could potentially be supplied by Whitesell to Whirlpool if certain criteria were met (Exhibit B–1), (3) parts that would not be supplied by Whitesell (Exhibit B–2), and (4) the Whirlpool manufacturing divisions that were subject to the Agreement (Exhibit C). Although the SAA defined certain terms, "manufacturing facility" and "volume requirements", as used in the SAA, are not defined in the agreement.

The relationship between the parties became strained and in 2004 Whitesell filed suit against Whirlpool for breach of the SAA, contending that Whirlpool had ordered fasteners from other suppliers that should have been purchased from Whitesell. Whitesell sought several forms of damages, including damages for lost profits.

On January 16, 2009, after discovery ended, Whirlpool moved for partial summary judgment on Whitesell's claim for lost profits, stating that Whitesell was barred from recovering lost profits based upon a liability-limiting clause in the SAA. Alternatively, Whirlpool argued that even if lost profits were recoverable, Whitesell was precluded from recovering lost profits based on parts purchased for "safety stock"[1] and any parts ordered by Whirlpool's Benton Harbor Facility. Whirlpool argued that the SAA barred recovery on these issues because "safety stock" should not have been classified as part of its volume requirements and because the Benton Harbor Facility was not listed as a manufacturing facility in Exhibit C. The district court, *sua sponte*, issued a show cause order requiring Whirlpool to come

forward with evidence showing that the liability-limiting clause did not deprive Whitesell of "minimum adequate remedies." On October 13, 2009, after the parties briefed the issue, the district court denied Whirlpool's motion for summary judgment and held that the liability-limiting clause was unenforceable for lack of adequate remedies. The district court denied Whirlpool's alternative claims, stating that whether or not the SAA barred recovery of lost profits for safety stock and parts purchased by the Benton Harbor Facility were questions of fact that should be presented to the jury.

The case proceed to trial, and at the close of Whitesell's argument, Whirlpool moved for a partial directed verdict arguing that because Whitesell had only presented demonstrative exhibits listing the parts for which they sought lost profits, it had offered insufficient evidence to support those claims. The district court denied the motion, finding that an individualized breakdown of each part was unnecessary. The jury returned a verdict in favor of Whitesell on six of its seven claims. The jury awarded Whitesell damages in the amounts of $1.6 million for its inventory claim and $1.7 million for its phase-out provision claim. The jury also awarded Whitesell $22.4 million in damages for lost profits on its Exhibit B–1 parts, dual-sourced/diverted parts, miscoded parts, and parts purchased for safety stock.

At the end of the trial, Whirlpool moved for but was denied judgment as a matter of law and alternatively for a new trial. Whirlpool also renewed, and the district court rejected, the argument that the liability-limiting clause in the SAA precluded the $22.4 million lost profits award. The district court further rejected Whirlpool's

---

1. The term "safety stock" does not appear in the SAA, but in its brief, Whirlpool describes

the term as parts purchased as an emergency reserve.

renewed arguments regarding Benton Harbor parts and safety stock, finding factual issues subject to jury resolution and sufficient evidence to support the verdict. Finally, the district court rejected Whirlpool's renewed argument that Whitesell had not introduced sufficient evidence to support the verdict as to "dual sourced/diverted parts."

The court subsequently added pre-judgment interest and costs, resulting in a total judgment of $33,134,281 in favor of Whitesell. Whitesell moved to amend the judgment to reflect post-judgment interest starting from the date of the final judgment rather than the date of the initial judgment. This motion was denied.

Whirlpool appeals only from the jury's award of $22.4 million on Whitesell's "Lost Profits" claims plus interest and costs. Whitesell counter-appeals the interest award.

## DISCUSSION

### 1. SAA Liability–Limiting Clause

A question of contract interpretation is a question of law and is therefore subject to *de novo* review. *Boyer v. Douglas Components,* 986 F.2d 999, 1003 (6th Cir.1993). Because jurisdiction in this case is based on diversity of citizenship, we apply the substantive law of Michigan. *Hickson Corp. v. Norfolk S. Ry. Co.,* 260 F.3d 559, 566 (6th Cir.2001).

Whirlpool challenges the district court's determination that the liability-limiting clause in the SAA was void because it did not allow for minimum adequate remedies. Whirlpool contends that the plain language of the clause only barred Whitesell from recovering anticipated profits, incidental damages, and consequential damages, but allowed Whitesell adequate remedies outside of these exclusions.

Under Michigan law, "[t]he cardinal rule in the interpretation of contracts is to as-

certain the intention of the parties. To this rule all others are subordinate." *McIntosh v. Groomes,* 227 Mich. 215, 198 N.W. 954, 955 (1924). "Where a contract is unambiguous on its face, extrinsic evidence is inadmissible because no outside evidence can better evince the intent of the parties than the writing itself." *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm,* 475 F.3d 805, 812 (6th Cir.2007) (citing *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool,* 473 Mich. 188, 702 N.W.2d 106, 113 (2005)). According to the parol evidence rule, a court may not use extrinsic evidence to interpret contract language that is unambiguous. *Shay v. Aldrich,* 487 Mich. 648, 790 N.W.2d 629, 641 (2010).

The liability-limiting clause of the SAA reads as follows:

> In no event shall Buyer be liable to Seller for anticipated profits or for incidental or consequential damages for a claim of any kind, or for any loss or damage arising out of or in connection with this agreement, or from any performance or breach, termination or expiration of this agreement or any order.

Based upon our reading of the liability-limiting clause, we find that the language of this provision is unambiguous. This provision deprives Whitesell of any form of damages resulting from Whirlpool's failure to purchase. The district court, therefore, correctly determined that the clause deprived Whitesell of minimum adequate remedies. Whirlpool would have us read the provision as barring only anticipated profits as well as incidental and consequential damages. However, the next line of the provision goes on to state that the buyer will not be liable to seller for damages arising from *any* performance or breach. This effectively bars Whitesell from recovering direct damages from Whirlpool's failure to purchase. Without

an adequate remedy, Whirlpool had no incentive to continue purchasing from Whitesell. While parties are free to negotiate the specific terms of an agreement, "it is the very essence of a sales contract that at least minimum adequate remedies be available." Mich. Comp. Laws § 440.2719 cmt. 1.

■ Reasonable agreements limiting or modifying remedies are to be given effect. *Id.* Here, the clause completely deprives Whitesell of any remedy; therefore, it cannot be considered reasonable. For this reason, the district court correctly held that the liability-limiting clause should be stricken from the agreement and replaced by the remedies provided by the Michigan Uniform Commercial Code, which allows a seller to recover lost profits after a breach of contract.

Alternatively, Whirlpool asks this court to excise only portions of the provision instead of striking out the entire clause. Whirlpool contends that by removing the "or for any loss or damage arising out of or in connection with this agreement" section, the provision becomes enforceable. To support this argument, Whirlpool points to several cases in which courts have removed words or voided certain statements within a contract provision in order to keep the remaining portions enforceable. *See Prof'l Rehab. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 228 Mich. App. 167, 577 N.W.2d 909, 913 (1998); *Robinson v. A.Z. Shmina & Sons Co.*, 96 Mich.App. 644, 293 N.W.2d 661, 663 (1980); *Trim v. Clark Equip. Co.*, 87 Mich.App. 270, 274 N.W.2d 33, 35–36 (1978).

The cases referenced by Whirlpool, indeed, provide an alternative to completely striking down the language of the SAA. We, however, believe that each of these cases is distinguishable from the case before us. In both *Prof'l Rehab. Assoc.* and *Robinson,* the court, before striking out the offending portion of the provision, de-termined that the language was ambiguous and susceptible to several interpretations. In all of the cases, the court found that the offending portions were distinct and able to be separated so as not to invalidate the entire section. Here, we have already concluded that the contractual language is unambiguous and the provision, as a whole, works to deprive Whitesell of any remedy. Furthermore, even if we excise the section suggested by Whirlpool, the provision would still be invalid because it would relieve Whirlpool of any liability for any breach or failure to purchase.

## 2. Judgment as a Matter of Law

Whirlpool argues that even if the liability-limiting clause was unenforceable, as a matter of law Whitesell should not have been able to recover damages for parts purchased by the Benton Harbor Facility and other dual-sourced/diverted parts. Whirlpool contends that the SAA bars recovery of damages for the Benton Harbor parts and that there was not sufficient evidence for the jury to have awarded damages for the dual-sourced/diverted parts.

Denial of a motion for judgment as a matter of law is also subject to *de novo* review. *Noble v. Brinker Int'l., Inc.,* 391 F.3d 715, 720 (6th Cir.2004). We use the same standard of review that the district court uses. *United States v. Alpine Indus., Inc.,* 352 F.3d 1017, 1022 (6th Cir. 2003). "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1078 (6th Cir.1999).

### a. Benton Harbor Facility

■ Whirlpool argues that because Benton Harbor was not listed as a manufactur-

ing facility in Exhibit C, the parties did not intend to make Benton Harbor subject to the agreement. Benton Harbor's absence from the agreement, however, does not prove the parties' intent; instead it creates questions as to whether Benton Harbor was left off the list because it was not a manufacturing facility and if nonmanufacturing facilities were subject to the SAA. The parties do not agree on the effect of Benton Harbor's absence from the SAA, and because they offer conflicting interpretations of the provisions, it is deemed to be ambiguous. *See Wells Fargo Bank, NA v. Cherryland Mall Ltd. P'ship*, 295 Mich. App. 99, 812 N.W.2d 799, 807 (2011). Where a contract is ambiguous, the substance of the agreement is a question of fact for the jury. *Zinchook v. Turkewycz*, 128 Mich.App. 513, 340 N.W.2d 844, 848 (1983). For this reason, the issue was properly submitted to the jury.

The jury was presented with evidence showing that Benton Harbor was not a manufacturing facility, but was in fact a division that supported Clyde Ohio Manufacturing Facility—a facility listed in Exhibit C. Based upon this evidence, a reasonable juror could have found that Benton Harbor was purposely left off of Exhibit C but was still subject to the SAA based upon its supporting function to the Clyde Ohio Manufacturing Facility. This supports the verdict that Whirlpool breached the SAA by purchasing Benton Harbor parts from other suppliers.

### b. *Dual-sourced/diverted parts*

■ Whirlpool also argues that there was insufficient evidence to support the jury's verdict as to twenty-five parts (the dual-sourced/diverted parts) that were listed on a demonstrative exhibit that was not admitted into evidence. The exhibit listed parts that Whirlpool was obligated to give Whitesell the opportunity to bid on in order to provide the best total cost. Al-

though the exhibit was not admitted into evidence, Neil Whitesell testified that the exhibit was an accurate list of parts that Whitesell should have been given the opportunity to bid on and that Whirlpool bought the parts from other suppliers without allowing Whitesell to place a bid. The jury found this testimony to be trustworthy and credible. Absent evidence to refute that claim, we find the testimony sufficient to support the jury's verdict.

### c. *"Nine Parts"*

■ Finally, Whirlpool argues that the evidence was insufficient to support the verdict with respect to nine other parts. With respect to Part 62596, Whirlpool maintained that it was an assembly that included another part which, in turn, was listed among the B–2 excluded parts. However, the jury was entitled to conclude that a part not listed as an excluded part was not excluded from the scope of the SAA. Nor can Whirlpool rely on § 14's exclusion of "[i]tems used in any outsourced assemblies" because the part was the assembly and not an item used in an assembly. As for the other eight parts, there was evidence from which the jury could conclude: (1) that Whitesell had not surrendered its right to supply Part 8318096; (2) that Whitesell's quotes for Parts 8533957 and W10000070 were the lowest; and (3) that Whirlpool wrongfully delayed or prevented the transfer of Parts 3400090, 8281183, 340001, 3400639, and W10067840 to Whitesell. The district court did not err in denying Whirlpool's motion for judgment as a matter of law on Whitesell's claims with respect to these nine parts.

### 3. Motion for a New Trial

■ Whirlpool contends that it should be granted a new trial on the issue of "safety stock" because the jury's verdict that Whirlpool breached the SAA by purchasing "safety stock" from other suppliers

was against the weight of the evidence. We review a district court's denial of a motion for a new trial for an abuse of discretion, reversing only if we have a definite and firm conviction that the trial court committed clear error. *Sykes v. Anderson*, 625 F.3d 294, 322 (6th Cir.2010).

The parties contracted for Whitesell to supply Whirlpool with its volume requirements. The term "safety stock" is never mentioned in the SAA. For this reason, the district court determined that whether or not the purchase requirement included "safety stock" was an ambiguous question of fact to be determined by the jury. The district court also found that Whitesell presented the jury with significant evidence from which it could reasonably find that the purchase requirement extended to all parts purchased by Whirlpool, including "safety stock." During trial, Whitesell presented evidence that during negotiations, Whirlpool unsuccessfully sought a safety stock exception. Whitesell also presented testimony that "volume requirement" meant any requirement that Whirlpool had for those particular parts during the time frame of the contract.

We agree with the district court. The issue of "safety stock" was properly submitted to the jury, and there was sufficient evidence for it to conclude that "safety stock" was included in the volume requirement. Even if the evidence presented by Whitesell was minimal, as Whirlpool alleges, this would not rise to the level of clear error. The district court was correct in denying Whirlpool's motion for a new trial.

### 4. Pre-judgment/Post-judgment interest

 Whitesell appeals the district court's holding that pre-judgment interest ended and post-judgment interest began on the date of the initial judgment—February 18, 2010—as opposed to the date the final judgment issued May 10, 2010. Whitesell's pre-judgment interest rate was 3.101%. Its post-judgment rate was 0.34%.

Post-judgment interest is calculated "from the date of the entry of judgment." 28 U.S.C. § 1961(a). In *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 836, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), the Supreme Court determined the "date of entry of judgment" to be when damages have been meaningfully ascertained. Since *Kaiser*, the Sixth Circuit has applied the "meaningful ascertainment" for purposes of determining when post-judgment interest should begin. *See Coal Resources, Inc. v. Gulf & Western Industries Inc.*, 954 F.2d 1263 (6th Cir. 1992); *Adkins v. Asbestos Corp., Ltd.*, 18 F.3d 1349 (6th Cir.1994). On that basis, the district court determined that post-judgment interest should start from the date of the initial judgment[2]. We agree with the district court. The initial judgment was not set aside and represents the point in time at which damages were meaningfully ascertained. *See Stryker Corp. v. XL Ins. America*, 681 F.3d 806, 818 (6th Cir.2012). The date of the initial judgment is therefore when post-judgment interest properly accrued.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

**2.** In reading its conclusion, the district court relied on *Transmatic, Inc. v. Gulton Indus.*, 180 F.3d 1343 (Fed.Cir.1999), which it incorrectly cited as a Sixth Circuit opinion. *Transmatic* correctly applied Sixth Circuit precedent, and thus, although the citation was in error, the substance of the district court's analysis was accurate.